# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

COLLIN RAY LEWIS,                         )
                                          )
      Plaintiff,                       )
                                          )
v.                                        )     Case No. CIV-15-584-F
                                          )
CAROLYN W. COLVIN, Acting                 )
Commissioner of the Social Security       )
Administration,                           )
                                          )
      Defendant.                       )

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying Plaintiff's application for benefits under the Social Security Act. The Commissioner has answered and filed a transcript of the administrative record (hereinafter TR. ____). This matter has been referred to the undersigned magistrate judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B)-(C). The parties have briefed their positions, and the matter is now at issue. It is recommended that the Commissioner's decision be **REVERSED** and **REMANDED** for further administrative development.

## I.    PROCEDURAL BACKGROUND

Plaintiff applied for child's disability benefits on August 8, 2008, based on the earning records of his insured father, Jeff Lewis. (TR. 147-48). Apparently, that application was granted and Plaintiff received benefits through his 18th birthday on March 22, 2012. (TR. 31). As an adult, Plaintiff could continue to receive child's benefits through his 22nd birthday, if he applied for re-entitlement. *See* 20 C.F.R. § 404.351;

TR. 31 (administrative law judge's notation that child benefits could be paid "if the claimant is 18 years or older and has a disability that began before attaining age 22."). Although the record does not contain the re-entitlement application, the Court assumes *that* application is the subject of the current action and was filed on September 21, 2011. *See* TR. 31 ("On September 21, the claimant filed an application for child's insurance benefits, alleging disability began March 22, 1994."). Social Security documents indicate that the relevant period for the September 21, 2011 application was from March 22, 1994 through the date of the ALJ's decision. *See* TR. 48, 93, 137.

The application was denied initially on May 18, 2012, and on reconsideration on September 17, 2012. *See* TR. 31, 92-95, 97-103. Following an administrative hearing, the Administrative Law Judge (ALJ) issued an unfavorable decision. (TR. 31-40). The Appeals Council denied Plaintiff's request for review. (TR. 1-4). Thus, the decision of the ALJ became the final decision of the Commissioner.

## II.    THE ADMINISTRATIVE DECISION

In evaluating Plaintiff's claims of disability, the ALJ followed the five-step sequential evaluation process required by agency regulations. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); 20 C.F.R. § 404.1520. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 22, 1994, the alleged onset date. (TR. 33). At step two, the ALJ determined that Mr. Lewis had the following severe impairments: oppositional defiant disorder (ODD) and social phobia disorder. (TR. 33). At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the presumptively disabling impairments listed at

20 C.F.R. Part 404, Subpart P, Appendix 1. (TR. 34). At step four, the ALJ found that Plaintiff had no past relevant work. (TR. 39). The ALJ further found Plaintiff had the residual functional capacity (RFC) to:

> [p]erform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can understand, remember, and carry out simple, routine, and repetitive tasks. The claimant can respond appropriately to supervisors, coworkers, and usual work situations, but have no contact with the general public.

(TR. 35).

Because Plaintiff had no past relevant work, the ALJ proceeded to step five. There, he presented the limitations from the RFC to a vocational expert (VE) to determine whether there were jobs in the national economy that Plaintiff could perform. (TR. 89). Given the limitations, the VE identified three jobs from the Dictionary of Occupational Titles. (TR. 89-90). The ALJ adopted the testimony of the VE and concluded that Mr. Lewis was not disabled based on his ability to perform the identified jobs. (TR. 39-40).

## III.   ISSUES PRESENTED

On appeal, Plaintiff alleges the ALJ: (1) improperly considered his mother's testimony; (2) erred in the evaluation of Plaintiff's credibility; and (3) erred in determining the RFC and in failing to address Plaintiff's non-exertional limitations in the hypothetical question posed to the VE.

## IV.   STANDARD OF REVIEW

This Court reviews the Commissioner's final "decision to determin[e] whether the factual findings are supported by substantial evidence in the record and whether the

correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (internal quotation marks omitted).

## V.    ERROR IN THE ALJ'S CONSIDERATION OF TESTIMONY

In Proposition One, Mr. Lewis alleges that the ALJ improperly evaluated the testimony given by Plaintiff's mother, Kellye Lewis. (ECF No. 19:7-9). In Proposition Two, Plaintiff challenges the ALJ's credibility determination. (ECF No. 19:9-12). In connection with his second ground of error, Plaintiff asserts that the credibility determination was legally faulty and lacked substantial evidence in light of his mother's testimony and other evidence. Based on the intertwined nature of the claims, the undersigned will address them together. The Court should find merit in Plaintiff's allegations and conclude that remand is appropriate.

### A.    ALJ's Duty to Evaluate Plaintiff's Testimony/Credibility

Social Security regulations require a two-step process to evaluate a claimant's subjective allegations. First, the adjudicator must consider whether there is an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms. Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's

Statements, 1996 WL 374186, at *2 (July 2, 1996) (SSR 96-7p). Second, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to perform basic work activities. *Id.* In doing so, the ALJ must make a finding on the claimant's credibility based on a consideration of the entire case record, including the individual's own statements about the symptoms. *Id.* When evaluating the credibility of a claimant's allegations, the ALJ must consider factors including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

It is not enough for the ALJ to simply recite the factors, although he need not undergo a formalistic factor-by-factor recitation of the evidence. *Id.* at *4; *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). However, in considering the factors, the ALJ must "set[ ] forth the specific evidence he relie[d] on in evaluating the claimant's

credibility." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012). The ALJ must give specific reasons for the credibility finding, and must be sufficiently specific regarding the weight given to the individual's statements and the reasons for that weight. SSR 96-7p at *4. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Id.*

## B.    Relevant Medical History

In the instant case, the nature of Plaintiff's impairments, namely his ODD and agoraphobia/social phobia, directly impacted his testimony which, in turn, affected the ALJ's credibility determination. Thus, to properly evaluate the ALJ's credibility determination, an analysis of the relevant medical history is necessary.

### 1.  Treating Physician Records

The record contains treatment notes from Plaintiff's treating physician, Dr. David Seitsinger, from February 2005 through August 2011. (TR. 284-287). In 2005, Dr. Seitsinger noted that Plaintiff's mother had pulled him out of school because Plaintiff was "somewhat oppositional" and had lost all of his recess for the entire year. (TR. 287). In October 2005, Dr. Seitsinger noted continued discipline problems, prescribed Straterra, and referred Plaintiff to a psychiatrist. (TR. 287). In December 2005, Dr. Seitsinger diagnosed Plaintiff with ADD and noted that he "act[ed] out" and exhibited "oppositional behavior." (TR. 276). In January 2006, Dr. Seitsinger noted continued oppositional behavior, diagnosed Plaintiff with obsessive compulsive disorder, and referred him to a psychologist. (TR. 286).

In February 2008, the doctor diagnosed depression and anxiety, noting that Plaintiff had been pulled out of school due to behavior problems. (TR. 285). In August 2008, Dr. Seitsinger diagnosed social phobia, mood disorder, severe anxiety, major depression, and questionable conduct disorder. (TR. 285). At that time, the doctor noted that Plaintiff would not leave his home, was antisocial, refused to attend school, only had one friend whom he did not care about, and had seen numerous psychologists. (TR. 285). In January 2009, Plaintiff's parents saw Dr. Seitsinger about their son who refused to attend the appointment, and told the doctor that Mr. Lewis was antisocial, was watching internet porn, would not leave the house, and would not brush his teeth or use soap or bathe. (TR. 284). The doctor diagnosed Plaintiff with social phobia, social anxiety, and questionable conduct disorder. (TR. 284). In August 2011, Dr. Seitsinger noted that Plaintiff refused to: go to school, see a psychiatrist, take medications, and leave the house. (TR. 284). The physician referred Plaintiff for home health care services due to his social phobia/agoraphobia. (TR. 284).

## 2. School Records

In February 2008, during Plaintiff's 7th grade school year, school officials met to review Plaintiff's Individualized Education Program (IEP). There, Plaintiff's special education teacher noted that during a five-month period, Mr. Lewis' high anxiety had caused him to miss 22 days of school and fail all of his classes. (TR. 170). At that time, teachers and Mr. Lewis' mother agreed that he would be pulled from school and continue his education on a homebound program. (TR. 170). One of the goals listed in Plaintiff's IEP was to "gradually begin to get out in public more." (TR. 174). As part of

the IEP, Plaintiff was evaluated to determine if he qualified for "extended school year services." (TR. 178-179). Ultimately services were declined, with his special education teacher noting: "[Plaintiff's] phobias are such that he can't even attend school during the year. Summer school ESY is not needed at this time. He needs to concentrate on getting healthier mentally before any extra school time would be considered." (TR. 179).

### 3. State Agency Records

On December 29, 2011, a mental consultative evaluation was scheduled for Plaintiff, but he refused to attend the appointment. (TR. 243). Instead, Plaintiff's mother attended the appointment and was interviewed by Dr. Stephanie Crall regarding her son's mental history and current status. (TR. 243-244). Dr. Crall noted that "[t]he information provided by Ms. Lewis was viewed as being valid and reliable." (TR. 243). According to Dr. Crall's report, Ms. Lewis stated that her son:

- Had been diagnosed with major depressive disorder, attention deficit disorder, and pervasive developmental disorder, not otherwise specified,

- Seemed to be "in his own world,"

- Did not like to be touched,

- Had no understanding of others' feelings,

- Experienced great difficulty adapting to new situations,

- Had been prescribed Seroquel and Straterra in the past, but currently refused to take any medications,

- Had refused counseling services,

- Should be in the 12th grade but refused to attend school over a year prior, at age sixteen,

- Began refusing to attend school in the 5th grade,

- Had no friends,

- Did not display affection for anyone,

- Refused to complete personal hygiene tasks, including refusing to change his underwear for three or four months, and

- Refused to complete household tasks.

(TR. 243-244).

In April 2012, Plaintiff's mother completed a function report for Plaintiff. (TR. 198-205). There, Ms. Lewis stated: "Collin has agoraphobia. Does not function accordingly in social situations. He has social anxiety & phobia and refuses to take medication." (TR. 198). In describing Plaintiff's daily activities, Ms. Lewis stated that her son stayed at home all day with no regular sleep pattern, shopped online for electronics, played the piano and video games, and if he ever left the house, he would not go inside any stores-but instead stayed in the vehicle because he avoided people and crowded places. (TR. 199, 201-202). Ms. Lewis also stated that her son did not interact or communicate with others and was unable to comprehend social cues. (TR. 203). She stated that Mr. Lewis refused to follow instructions, refused to take medication, refused changes in routine, avoided authority figures, and suffered from stress-induced "meltdowns." (TR. 204-205).

Due to his agoraphobia/social phobia and/or ODD, Plaintiff refused to attend a State Agency consultative examination, therefore was evaluated in his home on April 12, 2012 by Dr. Gail Poyner. (TR. 206, 207, 248-250). Dr. Poyner noted that Mr. Lewis:

- Was rude and sarcastic to her and his mother,

- Exhibited fleeting eye contact and several times stated "this is awkward,"

- Denied any mental health problems or that anything was wrong with him, stating "I'm just weird. I'm stupid.,"

- Refused the examiner's efforts to obtain more information from him, by reading, but not answering, written questions, then throwing the paperwork on the table "in an oppositional manner,"

- Stated that he did not agree with his mother's diagnoses of him,

- Laughed at his mother and said "Yah right" when she described a mental breakdown he had in the 4th grade,

- Refused therapy, stating he didn't need it,

- Stated that he had four or five friends with whom he socialized in his home,

- Stated he wanted to get his GED and a job,

- Agreed that he refused to do household chores because "[his mother] won't ask [him] nicely, so [he] [would not] do them."

(TR. 248-259). In sum, Dr. Poyner diagnosed Plaintiff with social phobia and ODD. (TR. 250). Dr. Poyner further stated: "It is believed that a major source of Collin's problems involve his oppositionality and refusal to engage in activities that he dislikes." (TR. 250). Dr. Poyner recommended counseling and stated that with a desire to reduce his anxiety and cooperation with treatment, his prognosis for improvement was good. (TR. 250).

On April 23, 2012, a State Agency psychologist reviewed Plaintiff's medical records, including Dr. Poyner's examination, and concluded that Mr. Lewis had agoraphobia, did not function according to social situations, his allegations of limitations were "partially credible," and treatment would improve his condition. (TR. 265).

### C.    Claimant's Testimony

At the hearing, Plaintiff testified that he lived with his mother and went to school through the 5th grade, but was thereafter homeschooled. (TR. 54). When asked how far "grade-wise" he was able to go in homeschooling, Plaintiff stated "I have no idea." (TR. 54). Plaintiff also testified that he played video games, played the piano, and used the computer. (TR. 56-59). Mr. Lewis stated that he drove with no problems, but admitted that he had gotten in a wreck that it was his fault. (TR. 60-61). He testified about how he was supposed to play the piano in a recital, but he did not attend. (TR. 57). When asked about how long each day he played video games, he stated "I don't know." (TR. 58). After three follow up questions from the ALJ in trying to obtain the answer, Plaintiff stated that he played video games for 1-2 hours daily. (TR. 58).

When asked about the frequency of his smoking cigarettes and drinking alcohol, Plaintiff replied "I don't know" and "I don't remember." (TR. 60-61). He twice stated he didn't remember the last time he drank alcohol, and when the ALJ asked him if it was more or less than five times, Mr. Lewis stated "Sure." (TR. 61-62). After two more follow up questions by the ALJ, including "Have you drank alcohol more or less than five times" Plaintiff stated "More." (TR. 62). Plaintiff admitted to taking an overdose of Oxycotin which caused him to be admitted to Red Rock. (TR. 62). When asked whether he had taken the overdose on purpose, he stated "I don't know." (TR. 67). Plaintiff stated that he had seen a psychologist, but did not remember when. (TR. 64). Mr. Lewis said he had been referred to counselors, but had never gone. (TR. 64-65).

Plaintiff stated that he has "countless friends" with whom he socializes, but then stated that he did not hang out with them anymore. (TR. 59, 66, 69).

Regarding his work history, Plaintiff stated that he worked at Crest for a little over a month, but he quit, because "it [got] old after awhile" and "it just repeated over and over again" and he couldn't take it. (TR. 67-68).

### D. Claimant's Mother's Testimony

Claimant's mother, Kellye Lewis, also testified at the hearing. (TR. 69-87). Ms. Lewis corroborated some of Plaintiff's testimony and gave a broader and more detailed picture of Plaintiff's daily activities and functional limitations. For example, Ms. Lewis testified that Plaintiff was homeschooled beginning in the 5th grade after a male teacher physically shook him, which caused Plaintiff to have a "nervous breakdown." (TR. 70). During his 6th grade year, Plaintiff attended a small country school for 6 months, but then finished that year with homebound teachers. (TR. 71). Ms. Lewis stated that she tried to get her son back into school for 7th grade, but after 7 weeks, he refused to get out of the car or when he did, he would hide behind dumpsters. (TR. 78). Plaintiff was schooled through a homebound program until he was 16 years old, which is when he quit and thereafter refused formal schooling. (TR. 71). During his homebound years, Mr. Lewis would sometimes meet the homebound teacher at the library, but he would often refuse to get out of the car at the library or hide in the library bathroom. (TR. 71-72).

Ms. Lewis reported that Plaintiff did not have any friends, and that the person he went to the movies with recently was Plaintiff's brother's friend. (TR. 72). According to

Ms. Lewis, Plaintiff drove 3-4 times a week, but she described the driving as "scary," detailing the wreck Plaintiff caused just two weeks after he obtained his driver's license. (TR. 72-73). Ms. Lewis described Plaintiff as a loner and stated that he walked a lot. (TR. 72-73). When she asked Plaintiff where he walked, he stated "toward the sun." (TR. 72). Ms. Lewis stated that Plaintiff had seen at least three counselors, but he currently refused any therapy and refused to take any medication. (TR. 74-75, 85). Ms. Lewis described her son's "meltdowns" as "push[ing] his head in" and then she apparently enacted something that Plaintiff did, which involved his hair and nose, which she described as a "tick" which he did 2-4 times when he walked in a room. (TR. 76).

Ms. Lewis confirmed that her son had been studying for the GED at home, but stated that when she drove Plaintiff to the GED classes or to take the test, Plaintiff refused to get out of the car. (TR. 78-79). Ms. Lewis also confirmed that her son plays the piano, but that he refused to play in a recital. (TR. 81-82).

Regarding Plaintiff's employment at Crest, Ms. Lewis stated that Plaintiff was scheduled to work Monday-Friday, and that he once tried to go to work on a Saturday when he was not scheduled. (TR. 83). His supervisor sent him home and then called Ms. Lewis and told her what had happened. (TR. 83). Apparently, Plaintiff's supervisor explained to him that he could not just come to work whenever he wanted, to which he replied "Yeah, I can." (TR. 83).

### E.     Error in the ALJ's Credibility Determination

In evaluating Plaintiff's credibility, the ALJ summarized Plaintiff's testimony. (TR. 36). Although the summary was accurate, it did not report what the hearing transcript

revealed and what medical professionals had witnessed and documented regarding Plaintiff's oppositional manner. At the hearing, Plaintiff displayed an overall uncooperative attitude, often refusing to answer the ALJ's questions, instead stating "I don't know" or "I don't remember" or "Sure." *See* TR. 52-69.

Following the ALJ's summary of Plaintiff's testimony, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(TR. 36). The ALJ then summarized a portion of the medical evidence, and made the following statement concerning Plaintiff's credibility:

> The description of the symptoms and limitations, which the claimant has provided throughout the record, has generally been inconsistent and unpersuasive. The claimant's testimony at the hearing that the reason he cannot work because it gets old after a while is not credible. The claimant socializes with friends, drives, leaves the house, plays video games, and plays piano. The claimant's mother also testified that the claimant has been studying for his GED. He has not engaged in treatment and is not taking medications. The claimant's mother testified that when on medications they were helpful. However, he has received no treatment.

(TR. 38). The ALJ provided five rationales for discounting Plaintiff's credibility:

- Plaintiff's description of his symptoms was inconsistent and unpersuasive,

- Plaintiff's statement for not wanting to work was not credible,

- Plaintiff socialized, left his house, played video games and the piano,

- Plaintiff had been studying for the GED, and

- A lack of medication or treatment.

As alleged by Plaintiff, the ALJ failed to link his rationales to specific evidence of record and the credibility determination otherwise lacks substantial evidence. Both errors warrant reversal.

First, the ALJ discounted Plaintiff's credibility, stating that his description of limitations had been inconsistent and unpersuasive, but the ALJ cited to no particular examples of inconsistencies. (TR. 38). The ALJ also stated that Plaintiff's reason for not wanting to work was "not credible," but the ALJ did not explain why he believed that to be the case. Because the ALJ failed to explain either rationale, or link them to specific evidence in the record, neither provides a sufficient basis on which to discount Plaintiff's credibility. *See Hardman v. Barnhart*, 362 F.2d 676, 679 (10th Cir. 2004) (reversing, in part, because "the ALJ failed to link or connect any of the [credibility] factors he recited to any evidence in the record."); *see also Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995) (stating that a credibility determination "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings" (quotation omitted)); SSR 96-7p at *4 (stating that credibility determinations cannot be based on intangible or intuitive reasons; rather they "must be grounded in the evidence and articulated in the determination or decision").

Second, the ALJ failed to consider the nature of Plaintiff's ODD when rejecting, as "not credible," Plaintiff's reason for quitting his job. The record is replete with diagnoses and examples of Plaintiff's ODD, and indeed the ALJ deemed the impairment

severe at step two. *See* TR. 33, 204-205, 207, 243-244, 248, 250, 276, 285, 286, 287.

ODD is defined as:

> a condition in which a child displays an ongoing pattern of uncooperative, defiant, hostile, and annoying behavior toward people in authority. The child's behavior often disrupts the child's normal daily activities, including activities within the family and at school. Symptoms may include actively refusing to comply with requests and rules.

*Leyba v. Astrue*, 803 F. Supp. 2d. 1259, 1268 (D. Colo. 2011) (internal citations and quotation marks omitted). The very nature of Plaintiff's ODD was displayed in his response to why he quit his job--because "it gets old after awhile." (TR. 67). Even so, the ALJ failed to consider the nature of Plaintiff's impairment as directly impacting his answer when the ALJ deemed Plaintiff's response "not credible." (TR. 38). Indeed, Plaintiff's oppositional behavior, coupled with the numerous records documenting the ODD, should have enhanced, not diminished, Plaintiff's credibility with regard to his statement about why he had quit his job. The ALJ's failure to consider the ODD when discounting Plaintiff's credibility based on the response was impermissible. *See Leyba*, 803 F. Supp. 2d. at 1268 (reversing, in part, because "the very behaviors the ALJ chose to rely on to find [plaintiff] not credible appear to be tied to [plaintiff's] impairments, a fact which the ALJ clearly ignored.").

Third, in discounting Plaintiff's credibility, the ALJ selectively and impermissibly relied on: (1) evidence that Plaintiff socialized with friends, drove, left the house, and played video games and the piano, (2) Plaintiff's mother's testimony that Mr. Lewis had been studying for the GED, and (3) the fact Plaintiff had not engaged in any treatment and is not taking medication. (TR. 38). These rationales are misleading and lack

substantial evidence when examined in light of: (1) testimony from Ms. Lewis regarding Plaintiff's agoraphobia, which is substantiated by the record and (2) Plaintiff's ODD.

The first two rationales are undermined by testimony from Ms. Lewis, which was supported by the record. According to Ms. Lewis, Plaintiff had no friends, contrary to his testimony otherwise. (TR. 72). The one friend he had testified going to the movies with was actually a friend of his brother's. (TR. 72). Ms. Lewis also testified that Plaintiff's testimony about leaving the house was when he was medicated, which was no longer the case. (TR. 86). And although Plaintiff played the piano at home, he refused to leave the house and play in a public recital, which Plaintiff himself confirmed. (TR. 57, 81-82). Finally, although Mr. Lewis and his mother confirmed that Plaintiff had been studying for his GED, the ALJ failed to explain how this fact would diminish Plaintiff's credibility regarding his ODD or agoraphobia. In fact, Ms. Lewis testified that although Plaintiff was studying for the GED at home, he refused to leave the car when she drove him to the location where he would attend classes and/or take the GED test. (TR. 78-79). This behavior, which the ALJ selectively omitted without explanation, was indicative of both diagnosed disorders-Plaintiff's ODD and social phobia/agoraphobia.

Ms. Lewis provided additional testimony regarding her son's schooling in further support of her son's social phobia/agoraphobia. She testified that Plaintiff had to be educated via homebound services because he would not leave the house to attend school. (TR. 70, 71, 72, 78). And on occasion, when the homebound teacher would ask to meet Plaintiff at the library, Ms. Lewis stated that her son would hide in the library bathroom or refuse to leave the car. (TR. 71-72). Ms. Lewis' testimony is supported by

evidence in the record from school officials and medical professionals. (TR. 170, 198, 201-202, 207, 243, 248, 250, 284, 285).

The ALJ summarized a portion of Ms. Lewis' testimony, but omitted any discussion regarding Plaintiff's:

- Refusal to attend school,

- Lying about having friends,

- Hiding behind dumpsters and refusing to leave the car to attend school,

- Refusing to leave the car at the library for homebound classes or hiding in the library bathroom,

- Refusing to attend a piano recital, and

- Refusing to leave the car to attend GED classes or take the test.

(TR. 36). The very nature of Mr. Lewis' ODD made it imperative that Ms. Lewis' testimony be considered when evaluating Plaintiff's credibility. *See Leyba*, 803 F. Supp. 2d. at 1268. Ms. Lewis' testimony, in turn, was consistent with the evidence of record, rendering her version of the events more reliable. Although the ALJ summarized a portion of Ms. Lewis' testimony, he omitted key details that contradicted Plaintiff's version of the events, which was impermissible. *See Sitsler v. Astrue*, 410 F. App'x. 112, 117 (10th Cir. 2011) ("an ALJ cannot use mischaracterizations of a claimant's activities to discredit his claims of disabling limitations.") *see also Talbot v. Heckler,* 814 F.2d 1456, 1462, 1464 (10th Cir. 1987) (noting that the ALJ improperly based his conclusion that claimant could do light work on a mischaracterization of his activities).

Finally, the ALJ cited Plaintiff's lack of treatment or medications as a basis to discount Mr. Lewis' credibility. (TR. 38). Evidence regarding medication and other forms

of treatment are factors to be considered in evaluating a claimant's credibility. *See* SSR 96-7p at *3. But the ALJ's statement regarding Plaintiff's lack of medication is partially inaccurate and somewhat misleading.

For example, in October 2005, Dr. Seitsinger prescribed Plaintiff Straterra and referred him to a psychiatrist. (TR. 287). In January 2006, Dr. Seitsinger referred Plaintiff to a psychologist. (TR. 286). In August 2008, Dr. Seitsinger noted that although Plaintiff had seen numerous psychologists, he would still not leave his home, was antisocial, and refused to attend school. (TR. 285). In August 2011, Dr. Seitsinger noted that Plaintiff refused to: go to school, see a psychiatrist, take medications, or leave the house. (TR. 284). At that time, the physician referred Plaintiff for home health care services due to his agoraphobia. (TR. 284).

In April 2012, Plaintiff refused to attend the disability State Agency consultative examination and was thus evaluated in his home. (TR. 207, 248-250). Dr. Gail Poyner conducted the examination and reported that Plaintiff told her he refused therapy, because he didn't need it. (TR. 248-249). Dr. Poyner diagnosed Plaintiff with Social Phobia and Oppositional Defiant Disorder, and stated: "It is believed that a major source of Collin's problems involve his oppositionality and refusal to engage in activities that he dislikes." (TR. 250). Dr. Poyner recommended counseling and stated that with a desire to reduce his anxiety and cooperation with treatment, his prognosis for improvement was good. (TR. 250). At the hearing, Mr. Lewis' mother testified that Plaintiff had seen at least three counselors at some point, but he currently refused any therapy and medication. (TR. 74-75, 85).

Although the ALJ's statement regarding lack of medication and other treatment was accurate with regard to Plaintiff's current state, the statement was inaccurate regarding Plaintiff's past use of medication and psychological treatment. Furthermore, based on Ms. Lewis' testimony and Dr. Poyner's opinion, it appears as though Plaintiff's refusal to engage in therapy or take medication was as a direct result of his impairments. Indeed, "[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse." *Austin v. Astrue*, 2011 WL 2443682 (W.D. Okla. 2011) (citing *Pates–Fires v. Astrue,* 564 F.3d 935, 945 (8th Cir. 2009) (internal quotation omitted) (collecting cases). Without considering the very nature of Plaintiff's impairments, the ALJ impermissibly discounted Mr. Lewis' allegations and misstated his past use of both medication and other therapy. As a result, this rationale cannot stand.

**F.  Summary**

The ALJ supported his credibility determination by: (1) making statements concerning Plaintiff's credibility that were not linked to specific evidence of record and (2) relying on selective and misleading portions of the record, without consideration of the very nature of Plaintiff's disability. As a result, the Court should conclude that the credibility determination is legally faulty and lacks substantial evidence, warranting remand.

## VI.    ERROR IN THE RFC

At step four, the ALJ concluded that Plaintiff retained the RFC to:

> [p]erform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can understand, remember, and carry out simple, routine, and repetitive tasks. The claimant can respond appropriately to supervisors, coworkers, and usual work situations, but have no contact with the general public.

(TR. 35). Mr. Lewis asserts that the RFC does not account for non-exertional impairments related to his agoraphobia or ODD. (ECF No. 19:13-14). In support, Plaintiff argues that the ALJ failed to discuss "all of the relevant medical and school evidence" and instead "simply ma[de] conclusory statements in his decision." (ECF No. 19:13-14). As a result, Plaintiff alleges that the hypothetical presented to the VE was faulty because it failed to include all of Plaintiff's impairments. (ECF No. 19:14).

Plaintiff only presents a substantive argument regarding a lack of limitations related to his agoraphobia. *See* ECF No. 19:13 ("If the ALJ had recited an RFC based upon all the Claimant's medically determinable impairments with specificity, and inquired of the Vocational Expert based upon the same, the Claimant would've been limited to a RFC that would encompass inconsistent attendance due to Claimant's inability to consistently leave his house.") As a result, the Court should limit its discussion to the same. *Kirkpatrick v. Colvin*, ___ F. App'x. ___, 2016 WL 5920745, at *3 (10th Cir. Oct. 11, 2016) ("it isn't [the Court's] obligation to search the record and construct a party's arguments.")

As alleged by Plaintiff, his agoraphobia is well documented by the medical evidence, school records, and Plaintiff's mother's testimony. *See* TR. (TR. 70-72, 78-78.

81-82, 170, 198, 201-202, 207, 243, 248, 250, 284, 285). The ALJ, however, cites very little of the evidence. For example, the record contains evidence from Plaintiff's treating physician, Dr. Seitsinger, for a period of approximately six and one-half years. See TR. 284-87). There, the physician repeatedly noted Plaintiff's antisocial behavior, and refusal to leave the house. (TR. 284-287). But the ALJ cites only two records from Dr. Seitsinger, one from 2009, and one from 2011, noting "no other care or treatment was provided." (TR. 36). The ALJ noted that the records indicated that Plaintiff would not leave the house, but the ALJ: (1) omitted discussion of Dr. Seitsinger's opinions from 2005, 2006, 2008, and 2009 and (2) failed to state what weight, if any, was given to the opinions of this treating physician. (TR. 36).

Likewise, the ALJ mentioned one report from a school official in 2005, regarding Plaintiff's use of Straterra, but the ALJ failed to discuss the impact of the fact that Plaintiff had to be homeschooled essentially since the 5th grade. Since that time, Mr. Lewis consistently refused to attend school, and when expected to meet homebound teachers at the library, he would hide in the library bathroom or refuse to leave the car. (TR. 78). Plaintiff also exhibited his agoraphobia by refusing to leave his home for the State Agency consultative examination, which had to be performed by Dr. Poyner in Plaintiff's home. (TR. 248-250). Finally, although Plaintiff was studying for the GED during the time of the hearing, Plaintiff's mother noted that Mr. Lewis refused to leave the car to attend the GED classes or take the test. (TR. 78-79).

The record is replete with examples of Plaintiff's social phobia/agoraphobia. Indeed the ALJ deemed the impairment severe at step two. (TR. 33). At the hearing,

the VE testified that competitive work would be eliminated if an individual had to miss two or three days of work per month due to his impairments. (TR. 90). But despite the overwhelming evidence of Plaintiff's social phobia/agoraphobia and concrete examples of how the impairment has affected Plaintiff's life, the ALJ failed to adequately discuss the impairment or explain its impact on Plaintiff's ability to consistently work. Accordingly, the Court should conclude that the RFC, lacks substantial evidence.

## RECOMMENDATION

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties, the undersigned magistrate judge finds that the decision of the Commissioner should be **REVERSED** and **REMANDED** for further administrative development. On remand, the ALJ should re-evaluate Mr. Lewis' credibility and consider his testimony in light of his ODD, and testimony from Ms. Lewis, which is supported by the record. The ALJ should also re-evaluate the RFC and Mr. Lewis' ability to work in light of his agoraphobia.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to file specific written objections to this Report and Recommendation. *See* 28 U.S.C. §636 and Fed. R. Civ. P. 72. Any such objections should be filed with the Clerk of the District Court by **December 19, 2016**. The parties are further advised that failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010).

**STATUS OF REFERRAL**

This Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED on December 5, 2016.

_____
SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE